[PHILADELPHIA, JANUARY 14, 1834.]

## ANKRIM *against* WOODWARD and Others, Trustees under a Domestic Attachment, &c.

### IN ERROR.

In an action by the trustees under a domestic attachment issued against *A.*, brought to recover from *B.*, the father of *A.*, the proceeds of the sale of goods in a store which had belonged to *A.*, and the amount of debts due to *A.* collected by *B.*, it is competent to the defendant to prove by the testimony of any disinterested witness, admissions, declarations and acts of *A.* made or done at any time prior to the issuing of the attachment, tending to show, that he had given to his father the store and books of accounts, towards securing a debt which he owed to his father ; notwithstanding *A.* was examined as a witness on the trial for the father, and testified to nothing having passed between him and his mother (who was alleged to have been his father's agent in this matter) on the subject of the store and books of account, and of his giving them up to his father, for any purpose whatever.

But without any agreement between the father and the son, by which the latter assigned to the former the store, goods, and books of account, if the son before the writ of attachment issued, gave up to the father the goods and books for the purpose of enabling him to satisfy the debt due to him, out of the proceeds of the sale of the goods and the moneys collected, and the father, before the suing out of the writ, accepted them for that purpose, he would be entitled to have his debt satisfied out of the money arising from the sale of the goods and the collection of the debts, whether the debts were collected before or after the issuing of the writ of domestic attachment.

The trustees under a domestic attachment are only invested with those rights which existed in the person against whom it issued immediately before the writ is sued out, unless he before that time assigned or conveyed away his estate, or any thing belonging to him for the purpose of defrauding his creditors; in which case the trustees have power, under the fifth section of the act of 1807, to recover and dispose of whatever may have been so conveyed away, in the same manner as if he had been seized or possessed thereof at the time of suing out the writ of attachment.

(Ankrim *v.* Woodward and others.)

Writ of error to the Court of Common Pleas of *Chester* County.

In the court below the action was *assumpsit*, brought against the plaintiff in error, *Josiah Ankrim*, by *John Woodward, John Way* and *George Gregg*, trustees under a domestic attachment issued at the suit of *Dennis M'Credy* and *Samuel Parker*, trading under the firm of *M'Credy & Parker*, against *Adam Jenner Ankrim*, the plaintiffs below and defendants in error.

The defendant below pleaded *non assumpsit*, and two special pleas of set off, averring that *Adam Jenner Ankrim*, prior to the issuing of the domestic attachment, and the trustees, prior to the commencement of this suit, as trustees, &c., were indebted to the defendant in a larger sum than that claimed in this suit.

The replications to the special pleas merely traversed the allegation that the plaintiffs, as trustees, were indebted, &c.

Upon the trial, the plaintiffs, among other things, gave evidence that *Adam Jenner Ankrim* was a son of the defendant, *Josiah Ankrim*, and kept store in *Jennerville, Chester* county, near his father's residence, for about one year, *viz.* from *September* 1825, to *October*, 1826, when he left the state, and his father took possession of the store, goods, and books, under circumstances tending to show a misunderstanding between them; that the father afterwards treated them as his own, sold out the goods, and collected some of the debts.

The domestic attachment was issued on the 8th of *September*, 1827, and this suit commenced on the 23d of *September*, 1830.

The defendant then proved that *Adam Jenner Ankrim* was indebted to his father in a large sum of money : That prior to leaving the state, he had married to his father's displeasure: That he continued keeping the store until *October*, 1826, at which time, (according to his own deposition read in evidence in the case) he delivered up the keys of the store to his sister *Margaretta Ankrim*, for the purpose of having them delivered to his father, that he might convert the effects of the store into the means of discharging the debt he then owed him : That he then resided in *New Jersey*, and was in business there, and intended to return to that state: That his father did not consent to his going into business as a storekeeper in the first instance, but afterwards became reconciled to it: That he was on such terms with his father, that he preferred delivering the keys to him through the hands of his sister, rather than directly to himself, and that it was his intention that his father should have his books of accounts, to collect the outstanding debts.

He annexed to his deposition a statement showing the debts due to his father, and explained the nature of them. They appeared to have arisen from money lent, and from debts paid by the father for the son. It also appeared that the amount of these debts exceeded the value of the goods in the store, when the father took possession of it.

The defendant's counsel then called as a witness *Delia Ankrim*, and in connection with the evidence thus given, proposed to ask her

(Ankrim *v.* Woodward and others.)

the following question :—" If you know any thing of a conversation between *Jenner Ankrim* and his mother, as the agent of your father, respecting a transfer by *Jenner* of his property in the store, and the debts due to *Jenner*, to secure his father, state it." The question was objected to by the plaintiffs' counsel, and overruled by the court, who signed a bill of exceptions.

The defendant's counsel then put the following question to the same witness :—" If you know that your mother was agent for your father, in obtaining a transfer by *Jenner* to his father of the store goods, and *Jenner's* outstanding debts to secure his father for debts due to him, state what you know." To which the witness answered thus:—" I believe my mother was agent for my father ; she was constituted agent by my father's conversations. "

The defendant's counsel then put the following question to the witness :—" Do you know of *Jenner* treating with your mother as agent of your father in the transfer of the store, books, &c. ?" This question being objected to by the plaintiffs' counsel, was overruled by the court, upon which another bill of exceptions was tendered and sealed.

The defendant's counsel then requested the witness to state, " what she knew of the transfer of the store by *Jenner* to his father;" to which the witness answered: " I was not present when *Jenner* put father in possession of the keys; my father did get possession of that store about the 6th of *October*, or within a few days of it."

The defendant also proved, among other things, by *Margaretta Ankrim*, that *Jenner* gave her the keys about the 6th of *October*, 1826 : That when he delivered them to her he requested her to hand them to her father, and tell him to manage the store in his own way, or make the best use of what was there : That she gave the keys to her father on the same evening, and she believed she mentioned to her father the statement her brother had made: That her father, the next morning took possession of the store and she attended it for her father, ever since it came into his possession : That it was at the time of the trial in her possession: That the value of the store goods at the time her father took possession was from twelve to fifteen hundred dollars, and that *Jenner* was not in possession of the store after the keys were delivered to her.

After having examined several other witnesses, and given in evidence certain documents, the contents of which it is unnecessary to state, the defendant again called *Delia Ankrim*, and requested her, " if she knew any thing of a negotiation between her mother (at the request of her father) and *Jenner*, but a short time previous to the delivery of the keys of the store to her sister *Margaretta*, respecting such delivery or transfer, to state it." The question was objected to by the plaintiffs' counsel, and the objection was sustained by the court, who sealed a third bill of exceptions.

In conclusion, the defendant's counsel requested the court to charge the jury as follows:

(Ankrim *v.* Woodward and others.)

" 1st. *Jenner* was by law permitted to prefer the debt due to his father, and such preference did not render the transfer fraudulent.

" 2nd. The debts due to the defendant from *Jenner* before issuing the attachment, must be set off against the claim of the trustees, so as to bar a recovery by the plaintiffs, except for the balance, if any, after the set off.

" 3rd. An assignment to an individual for his own use, in discharge of a debt to him, need not be recorded within thirty days, under the act of assembly.

" 4th. If the defendant by the authority of *Jenner*, either as agent, care-taker, or manager for *Jenner*, or under a transfer to himself by *Jenner*, in discharge of, or in security for his debts, collected the outstanding debts of *Jenner*, then he has a right to set off the debts due to him from *Jenner*, before issuing the attachment."

The court gave the following answers in writing to these propositions, which, at the request of the defendant's counsel, were filed of record :

" 1. The first is a correct abstract proposition, of the law of *Pennsylvania*, and is so laid down to this jury.

" 2. The pleas of set off in this case are wholly inapplicable ; there was not, nor could there be any mutual dealings between the trustees, plaintiffs and defendants, which is the foundation of the right to set off. The tenth section of the act of 4th *December*, 1807, relative to domestic attachments, which has been so strongly relied upon to support the proposition, has no bearing upon this question, but only prescribes the duty of the trustees when they come to distribute the effects among the creditors ; they will, under that section, give the defendant his dividend of the effects, upon the real debt due to him, after allowing the proper set off, in respect to the dealings between him and *Jenner Ankrim;* therefore the debt due from *Jenner* before the issuing of the attachment cannot be set off against the claim of the trustees, but the money due on *Jenner's* books, collected by the defendant, must go into the hands of the trustees for distribution amongst all the creditors; unless the jury shall believe it belongs to him in his own right, by virtue of a valid agreement and assignment before the attachment.

" 3. Affirmed by the court.

" 4. Nothing short of a *transfer or sale* to Dr. *Ankrim* of the debts due *Jenner Ankrim*, in consideration and satisfaction of a debt due to him, can prevent the trustees' recovery; an authority given by *Jenner* to his father, as agent, care-taker, or manager for him, will not, as before stated, protect from the operation of a domestic attachment; and there is no pretence for set off, as answered to the second of the two first propositions offered by the same counsel."

The jury found a verdict in favour of the plaintiffs below, for six hundred and forty dollars and fifty-four cents, and the defendant prosecuted this writ of error.

(Ankrim *v.* Woodward and others.)

The following errors were assigned in this court :

1. The court erred in rejecting the evidence offered, as set out in the three several bills of exceptions.

2. The court erred in their answer to the second and fourth propositions, as reduced to writing and filed.

3. The plaintiff's replications do not·traverse a material allegation of the pleas, to wit : that the said *Adam J. Ankrim* was indebted to the defendant before and at the time of the issuing of the domestic attachment.

After argument by *Dillingham* for the plaintiff in error, who cited *Stark. Ev.* part i. 47, part iv. 81 ; *Babb* v. *Clemson*, 10 *Serg. & Rawle*, 419 ; act of *December* 4, 1807, *Purd. Dig.* 72 ; 4 *Stark.* 1318, and by

*C. Gilpin* and *Tilghman* contra, who cited 3 *Stark.* 1301 ; *Crug* v. *Tuttle*, 3 *Conn. Rep.* 250 ; *Day. Rep.* 126 ; *Wolf* v. *Carothers*, 3 *Serg. & Rawle*, 240 ; *Duncan* v. *Findlay*, 6 *Serg. & Rawle*, 235,

The opinion of the court was delivered by

KENNEDY, J.—Three errors have been assigned in this case. They, however, embrace but two questions. *First*, Was the court below right in rejecting the evidence offered by the plaintiff in error who was the defendant below ?  And *second*, Did the court charge the jury correctly on the claim of the plaintiff in error to be allowed to defalcate the debt owing to him by his son *Adam Jenner Ankrim*, from the claim of the defendants in error, who sued as trustees appointed under a proceeding by writ of domestic attachment against the son, according to our acts of assembly made in that behalf?

On the first question, it appears that the evidence rejected by the court, was offered for the purpose of showing a treaty or negotiation between the wife of the plaintiff in error, as his agent, and their son *Adam Jenner Ankrim*, upon the eve of his removing to a distance, relative to his giving up a store of goods, of the value of from twelve to fifteen hundred dollars, and his books of account connected therewith, to the father, the plaintiff in error, that he might manage and make the best of them, and secure to himself by means thereof a debt of about eighteen hundred dollars, which he claimed that the son then owed to him.  It was testified by one of the daughters of the plaintiff in error, that the son on his going away delivered to her the keys of the store, with a request that they should be given to his father, and to tell him to manage it in his own way; or to make the best of *what was there*.  That she did do so, and that on the next morning thereafter, the father took possession of the store and books.  It was also further testified by the son himself, in his deposition which had been taken under a rule of the court and was read in evidence, that on his going away he delivered the keys of his store to his sister, for the purpose of delivering them to his father, that he might convert the effects in the store to the discharge of

the debt already mentioned; to the existence of which he also testified.

It appears to me, that the testimony rejected by the court below, was not only pertinent to the issue, but competent and admissible under any view that can be taken of it.   If the mother, on behalf of the father, either with or without authority from the father, proposed to the son to give up his store, and his books containing an account of the outstanding debts owing to him for goods sold out of the same, in order to secure to the father the debt which he owed to him, and the son assented to it, it would certainly tend to confirm and explain more fully the object of the son's giving up the keys of the store afterwards.  And the father's subsequent acceptance of the keys, might well be considered by the jury as equivalent to an assent on his part to the terms and conditions upon which the keys were originally proposed to be delivered by the son, as well as a confirmation of all that had been said and done by the mother in bringing about the giving up of the store, &c.; of which the handing over of the keys would be a good symbolical delivery; for, *omnis ratihabitio retro trahitur et mandato aequiparatur.*  Or suppose that the son did not give his assent at the time of the proposal made by his mother, but had said to her, he would consider of it, and on the next day following, or so, had delivered the keys in the manner testified to by his sister, might and ought not both in fairness to be considered as parts of the same transaction, the latter as an execution of what had been proposed the day or two before?  It seems to me, that the whole in such a case ought to be submitted to the jury.   This, in substance, was the nature of the evidence offered by the plaintiff in error, and rejected by the court.   It is said, it was not admissible because it related to what had taken place prior to, and at a time *different from the delivery* of the keys, and cannot therefore form any part of the agreement, even if there were one, under which the keys were delivered; nor yet lead to any certain conclusion with respect to the nature and extent of it.   This objection perhaps might in some measure be applicable, if the agreement alleged to have been made in this case had been committed to writing, and signed by the parties.   Because, where the agreement of the parties on the subject is committed to writing, the rational as well as legal presumption is, that every thing ultimately agreed on by them, is inserted in it.   So that in the course of their treaty, certain things may be agreed on, which afterwards, when they come at the close of their negotiation to put their final agreement in writing, are by consent modified, changed, or left out altogether as forming no part of it,   And wherever any thing has been so previously agreed on, which does not appear afterwards to be in the writing, the presumption is that the parties by the last act of their minds on the subject, resolved that it should not be part of their agreement, and therefore left it out of the writing.  Hence in part has arisen the general rule, that nothing which tends to alter, contradict or vary what is contained in the writing can be given in evi-

dence, unless it be also proved that it was left out of the writing by fraud or mistake. It may also be observed, with respect to written agreements, that the signing and delivery thereof is the consummation of them, which reduces their execution to a single point of time, and every thing that has been agreed on, within the compass of the writing, beyond which we are not to look. It is very different, however, in regard to oral agreements, which must be collected sometimes from various conversations and acts of the parties, had and done at different times.

From a circumstance which has been mentioned, of the father and son's not being on speaking terms at this time, the son possibly conscious that he had not treated his father and his advice with due respect, there is perhaps some reason to believe, that no formal and express agreement in detail was really entered into, under which the keys were delivered up : yet, it cannot be doubted, but that they were given up for some purpose, and upon an understanding and agreement of some kind. That being the case, this understanding and agreement must, as is frequently the case, be collected and obtained from previous conversations and subsequent acts on the subject. Those previous conversations and interviews must in every case of the kind be considered as having led to and caused the subsequent acts, when they cannot be accounted for but by referring them to those previous conversations : and the whole, when taken together, may develope pretty fully and clearly the design and intention of the parties, which is all that is desired in such cases.

Another objection is, that it being only evidence of what the son, *Adam J. Ankrim* said to his mother, and he being a competent witness in this case for the father to prove it, it is therefore mere hearsay to every other, and cannot be proved by any other than the son. This objection is founded upon an entire misapprehension of the true character and nature of the evidence. It is not what is properly called hearsay : neither is it evidence of a secondary character, as has been again alleged against its admissibility. It was offered for the purpose of proving an oral agreement, to which the son was a party. Now it is only by giving evidence of the declarations and acts of the parties to such an agreement, that it can be established : and third persons who were present, heard what was said, and saw what was done, are introduced and brought into court every day to testify to all they heard and saw upon such occasions. Their competency, and the admissibility of such testimony has never been doubted, where the parties to such agreement are also the parties to the suit in which the witnesses are called to testify. As the great object of adducing testimony, is to arrive at the truth, in order that justice may be administered, it is difficult to imagine why the change of parties to the suit should render a change of witnesses necessary, to prove the truth of the same facts, as long as they are not of the parties to the suit, nor interested in the event of it. The agreement consists of what is said and done upon such occasions, and third per-

sons who were present, hearing and seeing all that was said and done, are just as capable of relating it intelligibly and truly, as the parties or either of them would be; and sometimes much more worthy of being relied on for truth and accuracy. Whether an oral agreement was made or not; what were the terms and conditions of it, and who were the contracting parties, are matters of mere fact, which must be proved as other facts are; that is, by witnesses who were present at the making of the agreement, and heard and saw all that was said and done in respect to it. Mr. *Starkie,* in his *Treatise on Evidence,* part iv. page 81, says, " an oral contract may be proved by *any* witness who was present at the time, or who heard the defendant admit the existence of such a contract." And according to the doctrine laid down in *Gibblehouse* v. *Stong,* 3 *Rawle,* 437, I can perceive no good objection that could have been made to the plaintiff in error's having given in evidence the admissions of his son made at any time before the issuing of the writ of domestic attachment, showing that he had given his father the store and books of account, towards securing the debt which he owed to him; or any other admissions of the son, going to show that he had put his father in possession of the goods to dispose of them; and of his books to collect the money due on them. Any one not interested in the suit would have been a competent witness to have proved such admissions, who was present at the time and heard them made.

It has also been contended, that as the son's deposition was taken by the father, and he has testified to nothing having passed between him and his mother on the subject of the store and the books of account and the giving of them up to his father for any purpose whatever, that no other person can therefore be resorted to by the father as a witness for this purpose. There is nothing in this objection. The son is no more competent to prove this matter than any other who was present at the time: and every other person present, with the exception of the mother, is just as competent to prove it as the son. If a party has two or more witnesses by whom he can prove various facts, that is, all these various facts by each witness, he may call up one of them, and after getting his testimony as to some of the facts only, may forbear to examine him further as to the remaining facts; and if the witness does not in compliance with the obligation of his oath, declare as he ought his knowledge of them, the party calling him may dismiss him without it. But who ever heard before that by doing so he had put it out of his power to prove these remaining facts by any other witness? It cannot alter the nature of the case, that the witness so called was so connected with the remaining facts, that if true, he must have known their existence, unless perchance they had escaped his recollection. It was perfectly immaterial in this case whether the plaintiff in error called his son to prove any of the matters which he offered to give in evidence. They are all such as might be proved by any other. He was therefore not bound to call his son for such purpose if he had been standing by him. Any

(Ankrim *v.* Woodward and others.)

other person present at the time the thing took place, of which evi-
dence was offered to be given, was as competent as the son, and
therefore the father was at full liberty to exercise his own will in
this particular.  It is not like the case of subscribing witnesses to a
written contract or will, who, if within the jurisdiction of the court
where the existence of such contract or will is controverted, must be
first called by the party wishing to establish the instrument; and
until he has first called and examined them fully touching the execu-
tion of it, he cannot call any other witness : if, however, he fail to
prove the execution by the subscribing witnesses, he may then call
others.  The reason for this is, that the subscribing witnesses are
supposed to know more about the making and executing of the con-
tract or will, which they have been called particularly to attest, and
for that purpose to put their names to, than other persons whose
attention and notice of the matter do not appear to have been so
particularly required.  Hence the party is not left at liberty in the
first instance to call whom he pleases to testify, but is compelled by
the rule of law established in this behalf, to adduce first the sub-
scribing witness or witnesses, if to be had.  No such rule, however,
applies to the case under consideration.  I am therefore of opinion,
that the court below was wrong in rejecting the evidence offered by
the plaintiff in error.

On the second question, I also think that the court erred in charg-
ing the jury.  The president judge who delivered the charge of the
court to the jury, seems to have been most decidedly of opinion, and
so instructed them, that without an agreement made between the
father, the plaintiff in error, and his son *Adam Jenner Ankrim*, by
which the latter, in consideration and in satisfaction of the debt which
he owed the former, assigned, transferred, or sold to him the debts
owing to him, the son, for store goods sold and collected by the father,
the debt which the son owed to the father could not be set off or
defalcated out of the money so collected by the father.  If the father,
under an oral permission or authority from the son, and without any
transfer or assignment of these debts, collected them before the writ
of domestic attachment was issued, he had most unquestionably a
right as against the son to have the amount of the debt which the
son owed to him defalcated out of the moneys so collected.  This he
would clearly have been entitled to under the provisions of the defal-
cation act of 1705.  The father, after having collected the debts un-
der such permission or authority, would have stood indebted to the
son in the amount of the money so collected, and the son being pre-
viously indebted to the father, they would then have been mutually
indebted to each other in their own respective rights, thus bringing
the case directly within the very letter as well as the spirit of the
defalcation act.  If the son after this, and before the issuing of the
writ of domestic attachment against him, had brought a suit against
his father for the recovery of the money so collected, the father
would have had a right to set off his debt owing to him by his

(Ankrim *v.* Woodward and others.)

son, against the son's claim, so far as was necessary to satisfy it. Such being the right of the father against the son, upon this statement of the case, before the suing out of the writ of domestic attachment, I am at a loss to conceive how the suing out of that writ could divest the father of his vested rights, or place him in a worse situation with respect to his debt against his son than he was before. The defendants in error, as trustees for the creditors of the son, by virtue of their appointment and the acts of assembly relative to domestic attachments, are only invested with those rights which existed in the son at and immediately before the suing out of the writ of domestic attachment against him; and have no power or authority beyond what he had at that time; unless where he before that assigned or conveyed away his estate, or anything belonging to him, for the purpose of defrauding his creditors, in which case the defendants in error, by the fifth section of the act of 1807, have full power given them to recover and dispose of whatsoever may have been so conveyed away, in the same manner as if the son had been seized or possessed thereof himself at the time of suing out the writ of attachment. With this exception, it is manifest from the whole tenor of the acts of assembly on this subject, that the trustees have no right to claim what the son himself could not have claimed at the time of suing out the writ of domestic attachment. I am also further of opinion, that if the son, before the suing out of the writ of attachment against him, had brought an action of debt, or on the case, and declared in *assumpsit* for money had and received, against his father, the father might have set off the debt owing to him by the son, against the claim of the son, without giving any evidence to show that he had had even an authority from his son to collect the money; because the son, by bringing such action against the father, would have affirmed the authority of the father to collect and receive the money, and would thereby have acquitted those who had paid it to the father. And it seems to me likewise, that the trustees, by bringing this action against the father, have affirmed his authority to receive the money; and if it was received by him before the suing out of the writ of domestic attachment, he would have a right to set off any debt owing to him anterior to that time by the son. If the defendants in error had not intended to affirm the authority of the father to receive the money, they ought to have looked to those persons respectively from whom the father received it.

From what I have already said on this second question in this case, it necessarily follows, that if there was an agreement made between the father and son, by which the son assigned the goods and debts to the father, to satisfy or secure to the father the debt which he owed to him; or if the son gave up the goods and his books of account to the father for this purpose, and they were accepted by the father before the suing out of the writ of domestic attachment against the son, the father would be entitled to have his debt satisfied out of the money arising from the sale of the goods and the collection of the

(Ankrim *v.* Woodward and others.)

debts; and it would be wholly immaterial upon either of these hypotheses, whether the debts were collected before or since the issuing of the writ of attachment.

The judgment is reversed and a *venire facias de novo* awarded, if the defendants in error should think that they have any chance of success in their suit, upon the principles here laid down.

Judgment reversed, and a *venire facias de novo* awarded.