## Moncure *versus* Hanson.

1. Under the 34th section of the act of Assembly of 16th June, 1836, relating to insolvent debtors, the estate of the debtor vests in the trustees appointed by the court, at the moment of his discharge, whether the trustees appointed become qualified or not: and there is, in this respect, no difference between property which has been *fraudulently* assigned by the insolvent before his application for the benefit of the insolvent laws, and his property which has not been so assigned.

2. Property fraudulently transferred by an insolvent prior to his discharge under the insolvent laws, still remains his property as it respects his creditors; and the trustees, when qualified, may recover the same under the provisions of the act of 1836. The power to recover such property, expressly given by the 36th section of the act, is merely cumulative, and does not restrain or limit the terms of the 34th section of that act.

3. Debtors having executed a voluntary assignment, which was afterwards declared to be fraudulent and void, subsequent to the assignment petitioned for the benefit of the insolvent laws and were discharged, but through mistake failed at the time to execute an assignment to the trustees appointed by the court, which was, however, afterwards done. A judgment was obtained against the insolvents *after their discharge, but before their assignment,* on which their real estate was sold. On an ejectment by the purchaser against one claiming by conveyance from the assignees in the voluntary assignment, the defendant may defend under the title existing in the assignees under the insolvent laws, and is not estopped from interposing that title because notice had been given, at the sheriff's sale, by the voluntary assignees, only of the title claimed under the voluntary assignment.

4. Estoppel applies only where the second title is in the party falsely or incautiously alleging the first, and the opposite party is ignorant of the former title: it does not apply where the sufficient title is outstanding in a third person, and was known to both of the contesting parties.

THIS case came up from the Nisi Prius, *Philadelphia.*

It was an action of ejectment by Henry W. Moncure against William R. Hanson, brought to March term 1846, to recover possession of a lot of ground on the north side of Chestnut street, Philadelphia.

Plaintiff showed title and possession in Isaac Phillips, one of the firm of R. & I. Phillips, and that on *the 22d day of January,* 1838, a judgment was obtained by the Farmers' Bank of Virginia *vs.* R. & I. Phillips, on a debt incurred in February 1837. This judgment was subsequently marked to the use of John H. Eustace, the drawer of the bill of exchange on which· the judgment had been obtained. On this judgment a *fi. fa.* was issued on Sept. 12th, 1838, under which the premises in question were on the same day levied on,

and, after sundry writs of execution, sold by the sheriff, in May 1839, to Mr. Fallon, who, when the judgment was marked to the use of Eustace, had entered his name on the record as attorney for Mr. Eustace, and as succeeding the attorney for plaintiffs on record. From Mr. Fallon, Eustace's attorney, title was afterwards deduced to Moncure, *the plaintiff.* At the sheriff's sale, notice was given by defendant's grantors that the premises did not belong to R. & I. Phillips, but had been assigned to them by deed of assignment of June 1837.

Hanson, the defendant, claimed to retain possession of the premises, under *deed* to him from Joseph Mora Moss and David Samuel, styling themselves assignees of the estate of R. & I. Phillips, dated 10th May, 1839.     The deed recites that, "whereas Isaac Phillips and Joseph L. Moss, by deed dated 22d June, 1837, did grant and convey, *inter alia,* the premises in question to said J. M. Moss and David Samuel, in trust for creditors," now the said indenture witnesseth, "that the said Joseph M. Moss and David Samuel, *assignees as aforesaid,* for and in consideration of $20,300," &c., granted and conveyed said premises *to Hanson ;* and the warranty was in the usual form given by trustees, viz. against acts done by them as assignees.     The assignment referred to in the deed was the voluntary assignment.

The defendant then gave in evidence the deed of assignment of 22d June, 1837, under which J. M. Moss and David Samuel had entered into possession of the premises, (being the deed fully copied in the case in 4 *Whar.* 402, and afterwards before this court in Weber *v.* Samuel, 7 *Barr* 500.)   Defendant likewise showed that the premises had been bought by him *at a public sale,* at which it was advertised that " *the title to the premises was undoubted, and that they were sold by order of assignees ;*" that he had paid one-third in cash, and had given his bonds and mortgage for the remaining two-thirds, which, with all the interest thereon, save that for six months, remain unpaid.     But it was in evidence that, at the time of this sale, the premises *were levied on and advertised to be sold under the execution under which plaintiff claims ;* and that *public notice was given at the time of sale of this fact ;* and that the right of the assignees to convey any title to the premises was disputed and denied.

Defendant likewise gave in evidence the record of the petitions of Isaac Phillips and Joseph L. Moss, filed October 2d, 1837, praying to be discharged as insolvent debtors, by which it appeared that they were discharged as insolvent debtors on 19*th October,* 1837, but that they failed to execute assignments of their estate to trustees till *September* 29*th,* 1838, when, by leave of the court, they executed the transfer to *G. Weber and H. P. McKean,*—the order of the court being, " that the date of the assignment be filled up as of that day, and that the time from which said assignment shall take effect to be thereafter determined by the proper authority."

Weber and McKean, on same day, gave bonds, and remained trustees for the creditors of the insolvents till February 7th, 1847, *when they were finally discharged from their trust.* The defendant showed that H. P. McKean and G. Weber & Co., in their individual rights, had, as releasing creditors, (but not till after Eustace's purchase,) received dividends out of the proceeds of other estate that passed by deed of June 22d, 1837. No evidence was given that as trustees they had done any act to declare their election to recover or claim these premises in avoidance of said deed of June 22d, 1837; but no evidence whatever was given of any single act by Weber and McKean, as trustees, going to show confirmation of defendant's title in any way.

The voluntary assignment to Moss & Samuel was afterwards decided to be void as against creditors of R. & I. Phillips. See Weber *v.* Samuel, 7 *Barr* 500; 6 *W. & Ser.* 300; 4 *Barr* 430.

Defendant likewise showed, that on November 8th, 1848, this court, sitting in equity, made a decree in a certain suit, in which D. L. Miller, Jr., successor to Weber and McKean as trustees, was plaintiff, and defendant as well as his grantors, J. M. Moss and David Samuel, were defendants, by which they ordered, among other things, that said J. M. Moss and D. Samuel (or rather that the receiver previously appointed) pay over and transfer to Miller all the moneys and securities, &c. received by them under color of said deed of assignment of June 22d, 1837, under which decree said Miller received, among other things, the bonds and mortgage given by Hanson in part payment of the premises, together with such part of the cash proceeds of the sale of the premises as remained still on hand. But it was likewise shown that Mr. Miller had, immediately on receipt of the same, advised defendant Hanson that he was willing *to confirm his title*, and convey to him the premises, upon his (Hanson's) withdrawing the defence he had set up to payment of said bonds and mortgage; which *Hanson declined to do, alleging that he had purchased the premises from the voluntary assignees of R. & I. Phillips, and assigning for cause of his refusal the outstanding of the Eustace title, viz. the title of Moncure, the plaintiff in this suit.*

The judgment in favor of the Bank of Virginia, on which the premises were sold, was confessed, "subject to the defendant's discharge under the insolvent laws of the commonwealth of Pennsylvania."

On the trial, the defendant defended his possession on two titles, viz. one in himself, derived by deed from the assignees of R. & I. Phillips in the voluntary assignment of June 22d, 1837; the other in the trustees in insolvency, whose title, he contended, related back to the date of the petition in insolvency, filed by R. &. I. Phillips in October 1837. See During's Appeal, 1 *Harris* 225,—a case arising out of the assignment of R. & I. Phillips.

The 34th section of the act of 16th June, 1836, relating to in-

solvent debtors, provides—"The trustees appointed as aforesaid shall be deemed to be vested with all the estate and property of the insolvent, at the time of filing his petition, subject to all liens by mortgage, judgment, or otherwise, existing at that date; and it shall be their duty to take the same into possession, and all books, vouchers, and papers relating to the same, and (they) shall be capable of suing for and recovering, in their own names, all such estate and property, and all debts and things in action belonging or appertaining to such insolvent *at the time of his petition, as aforesaid.*"

The 36th section provides—"If any insolvent, as aforesaid, shall, prior to such assignment, have conveyed or transferred any part of his real or personal estate to his wife and children, or either of them, or to any person in trust for them, or either of them, or shall have conveyed or transferred the same to any other person, with intent to defraud his creditors, the trustees aforesaid shall have power to recover and dispose of the same, as fully and effectually as if the said insolvent had been actually seised or possessed thereof at the time of such assignment."

The jury were instructed to find for the plaintiff.

To that instruction and other matters, error was assigned.

The case was argued by *Guillou* and *C. Fallon,* for Moncure; and by *E. S. Miller* and *H. J. Williams,* for Hanson.

The opinion of the court was delivered April 2, 1851, by

BELL, J.—After a long course of litigation in various forms, at law and in equity, it is settled that the assignment of June 22, 1837, solely considered, is invalid as against the contesting creditors of the assignors, with notice to the parties to be affected. Conceding this, the defendant, nevertheless, insists that his title, derived under that deed, has been confirmed by the acts and declarations of the trustees in insolvency, appointed under the respective petitions of Phillips and Moss; and if not, he avers a subsisting outstanding estate residing in the trustees before the recovery of the plaintiff's judgment, or, at least, a power peculiar to them sufficient to defeat the plaintiff's pretensions.

Under the view we take of the controversy, it is unnecessary now to say whether there has been such a ratification of the defendant's defective title as he alleges. In the absence of a necessity, it would be, obviously, improper to pronounce a gratuitous opinion on this point, which might affect the rights of parties not immediately before us. I, therefore, propose to confine the discussion to two only of the several questions mooted on the argument, as these cover the whole ground proper to be traversed in reaching conclusions decisive of the contest.

These are, first, whether the insolvent trustees took an estate in the premises claimed in these suits, by virtue of the proceedings in

[Moncure *v.* Hanson.]

insolvency, before the lien of the plaintiff's judgment attached? And, secondly, whether by the discharge of the insolvents the trustees were clothed with the exclusive power of contesting the assignment of June 1837, so as to bar what otherwise might be the legal effect of that judgment, and the subsequent proceedings had to enforce it?

It will be perceived that, if either of these questions admit of an affirmative response, this action must fail of success; since, without reference to the title set up by the defendant, the first answer would establish an outstanding estate in third persons, paramount to any supposed interest residing in the plaintiff as sheriff's vendee; and the second would paralyze the plaintiff's judgment, as a mode of invalidating the voluntary assignment, by interposing the insolvent trustees as the only persons who could, legitimately, attack that instrument.

The solution of each of them depends on the proper construction of the act of 16th June, 1836, regulating proceedings in insolvency. The inquiry is of moment, not only as regards the dispute immediately before us, but as establishing a general rule of property, though, doubtless, something of its consequence has been subtracted by the law abolishing imprisonment for debt.

The act of 1836 superseded that of 26th March, 1814, for which, and its supplements, the younger statute was intended as a substitute. It was originally reported to the legislature by the intelligent gentlemen appointed to revise our civil code, and was designed to present a complete system for the government of what was, at the time, recognised as an important branch of judicial jurisdiction. A comparison of its provisions with the statutes which preceded it will show that the object of its enactment was not change, or the introduction of new rules of property or practice, but to simplify existing regulations; to supply supposed defects of detail, and more perfectly to classify the various features of a system then diffused through several statutes, by reducing it within the compass of a single act of legislation, and thus presenting to the inquirer as well unity of provision as of design. The report accompanying the draft of the law,—which, as influencing the legislature in its subsequent enactment, may well be referred to,—shows this, as well as the unassisted frame of the act itself. With but very few exceptions, its features are almost literally copied from the act of 1814 and its supplements. These carry out the leading objects of the lawmakers, by designating the parties who may become the objects of the law; the mode of procedure to secure a participation in its benefits; the effect of a discharge under it, upon the person of the petitioner and others; its influence upon his property, real and personal, in possession or expectancy, and upon his future acquisitions; the punishment to be inflicted for detected fraud, and the mode of prosecution. Impressed with the general intent, thus

2 H 2

[Moncure *v.* Hanson.]

distinctly manifested, to adhere to the principles ascertained by existing laws, tested by experience, and the absence of any distinctly expressed design to introduce essential changes, an expositor of the revised statute ought to hesitate long to sanction a new reading, which works a total revolution in the mode of its operation upon a portion of the debtor's estate, and, it may be, in its effects upon his future exemption. And yet, this is the extent to which the plaintiff's argument would push us.

A short review of the acts of Assembly relating to the subject will assist to correct conclusions.

The first of these, necessary to notice, was passed the 14th of February, 1729–30, being the general law that immediately preceded the act of 1814. It gave very nearly the same form of oath to be administered to the petitioning debtor, and directed a similar examination, but differed from the succeeding act in the direction given to the court, to order so much of the lands, goods, or effects of the debtor as might be sufficient to satisfy his debts, cost of suit, &c., by a short indorsement on the back of the petition, signed by the petitioner, to be assigned to the creditors, or one or more of them, in trust for the rest, or to some other proper person to be appointed by the court; and then provided, that "by *such assignment* the estate, interest, and property of the lands, goods, and effects so assigned shall be vested in the person or persons to whom such assignment is or shall be made," &c.; and further, that "*immediately upon such assignment executed* the said prisoner shall be discharged out of custody," &c.

Then came the act of 1814, by which an alteration was, unquestionably, intended. Following, to some extent, the older enactment, its first, second, and third sections prescribed the form of oath to be administered to the insolvent, and the manner of his subsequent examination; provided for his discharge if, after examination, no presumption of fraud arose; the appointment of trustees by the court; that every trustee, before he acted, should give bond with surety for the faithful execution of the trust, and that, in case of refusal, he should be dismissed, and another or others appointed in his place, until some one be found willing to comply with the law. The fourth section directed, "that the trustee or trustees shall be deemed vested with all the estate of the said debtor at the time of his or their appointment, and may and shall take the same into possession, and all books, vouchers, and papers relating thereto; and shall be capable, in his or their own names, to sue for and recover any property or debts belonging to such debtor at the time of his or their appointment," &c. This and the succeeding sections invested the trustees with full dominion over the property of the debtor, whether in possession or action, for the purposes of recovery, conversion, and disposition. Here, and throughout the act, a design to omit a specific direction

[Moncure *v.* Hanson.]

for a formal assignment is apparent, no doubt because of its use-lessness.   Yet the practice established under the act of 1720 still continued, and, notwithstanding what must be agreed as the plain intent of the lawmakers, a question was made of the necessity of an assignment.   But it was determined that the estate of the insolvent vested in the trustees, immediately on his discharge, not by virtue of the assignment, but by force of the express provisions of the act, even without their assent, and remained so vested, though they refused to give the required security, until others were found willing to do so: Kennedy *v.* Ferris, 5 *Ser. & R.* 397 ; Stoever *v.* Stoever, 9 *Ser. & R.* 455 ; Power *v.* Hollman, 2 *Watts* 220 ; Ruby *v.* Glenn, 5 *Watts* 77 ; Keating *v.* Williams, 5 *Watts* 383.   The trustees were deemed mere depositories, holding for the creditors, whose interests were not to be jeoparded by the misconduct or omission of the trustees : Wager *v.* Miller, 4 *Ser. &. R.* 117. From these decisions it follows that, under the act of 1814, the question made here could not have arisen.   They settled that, though the act did not expressly annul, in favor of the trustees, fraudulent conveyances, yet all the property of the debtor, whether actually held by him or fraudulently conveyed, passed by the mere fact of his discharge and the appointment of trustees.   This, per-haps, was more particularly determined in Englebert *v.* Blanjot, 2 *Whar.* 240, overruling the decision of the District Court, where it had been held that as, under the fourth section of the act of 1814, the insolvent trustee stood in the place of the debtor, at the time of his appointment, he was bound by his prior acts, and therefore could not call into question existing dispositions of his property, though fraudulent ; the insolvent act containing no provision simi-lar to the fifth section of the act of 1807, relating to domestic at-tachments, which empowered the trustees under the attachment to recover and dispose of, for the general benefit, property fraudu-lently conveyed by the debtor.   But this court was of opinion that, though a fraudulent deed was to be esteemed good against a party to it, the moment the rights of creditors intervened, the law converted the parties into trustees for them, *ex maleficio*, holding for the benefit of the insolvent trustee.

So stood the rule when the act of 1836 was enacted.   It is simi-lar to its predecessor in the provisions I have particularly adverted to, and from whence they were adopted.   So far as is now im-portant to notice, its 34th section differs from the 4th section of the older statute, only by vesting the trustees with the estate and property of the debtor, at the *time of filing his petition*, instead of referring it to *the time of his discharge ;* and by saving the rights of innocent purchasers, and others without notice, which were be-fore liable to peril.

But the fourteenth section of the younger act enacts that, after the examination of the insolvent and oath administered, he shall

execute an assignment of all his estate and property to such trustees as may be nominated by the creditors or appointed by the court; and the fifteenth section is to the effect that when such assignment shall have been executed, the court shall make an order that the petitioner shall not at any time thereafter be liable to imprisonment by reason of any judgment or decree obtained against him for any debt due before.    Notwithstanding these provisions, and the argument founded in a critical analysis of them and other portions of the statute, by the learned judge who presided in the Circuit Court of the United States at the trial of Eustace *v.* Hanson, (reported in 2 *Howard's Rep.* 665 *et seq.*),—an argument I have examined with respectful attention, and with every disposition to be influenced by it,—I cannot bring my mind to his conclusion, that the legislature intended the formal execution of an assignment as a preliminary, indispensable to work a transfer of the insolvent's property to the trustees.    He assumed the ground that the younger statute was introductive of an entirely new system superseding the old, wherefore its provisions are to be construed without reference to the prior enactments.    But in this I am compelled to think he fell into error.    As already intimated, the last act was evidently copied from those which preceded it; and as the legislature had these in view, and must have been acquainted with the progress of judicial decision, I cannot believe it was intended needlessly to restore the peculiarity of the act of 1730, which made the assignment the only operative instrument of transfer, in direct contradiction of the provision borrowed from the act of 1814, which, omitting all provision for a written assignment, directed that the trustees should be deemed vested with all the estate and property of the insolvent *at the time* of filing his petition.    In the face of this, was it the object of the lawmakers to introduce so radical an alteration as that insisted on here, by merely directing an assignment in accordance with an existing practice? Did they design to decree that the accidental, or even wilful omission of a useless form, should reverse the settled doctrine of our courts, and overthrow the ascertained policy of the law?    Was it thought, by those who participated in the enactment of this statute, that the casual omission of the debtor's signature to the formal instrument printed at the foot of every insolvent petition, would leave in the debtor the property it was the object of the law to transfer to the creditor, and subject the insolvent again to be dealt with just as though no discharge had been pronounced?    The latter consequence of his construction so startled the learned judge to whom reference has been made, that he declined so to declare, rightly deeming that if an assignment was requisite to the exercise of the jurisdiction, the consequences might be very serious and alarming. And yet, it strikes us, they are not more so than must result from the doctrine that the creditors have no hold on or interest in their

[Moncure *v.* Hanson.]

debtor's estate if no assignment in fact be executed.   Of the serious inconvenience, not to say injustice, which would probably often flow from such a rule, the case before us furnishes a strong illustration.    Here is a creditor, perfectly cognizant of all that had taken place in the insolvent court, and who accepts the confession of his judgment, expressly "subject to the defendant's discharge under the insolvent laws," seeking to escape from the condition, at the expense of all the other creditors, because of a mere slip in the hurry of business.   To be sure, if this slip occasioned a failure in a material point, creating a legal advantage, the advantage must be conceded.   But to persuade to the adoption of a rule productive of such results, something should be required more stringent than merely verbal criticism, however ingenious.   The argument is, that all the sections of the act following the fourteenth are predicated upon the supposition that an assignment has been executed, and that their most important provisions, especially those of the thirty-sixth section, must become a dead letter if no assignment be made. But I cannot recognise this as a necessary consequence, nor can I concede that the whole authority of the court to discharge rests in the fact that an assignment has been made, and without which the action of the tribunal is *coram non judice*.   To this extent the proposition reaches, presenting a result too serious to hang upon the mere adaptation of language to meet the previous direction of an assignment, and more especially when, as I think, that language is not so imperative but that the provisions of the succeeding sections may be conveniently administered, though no assignment be made.   In a word, we are of opinion that as, under the act of 1814, an assignment was unessential to pass the debtor's estate,—though it was the practice to execute one in each case,—the legislature did not intend to make it indispensable, by simply directing it to be made by the act of 1836.   In construing an enactment, it is said to be proper to look to the old law, the mischief, and the remedy, and there is perhaps no safer canon of interpretation.   Now, certainly the want of direction for written assignments in the law of 1814 was not felt as an evil, nor can it be pretended the object of the act of 1836 was to supply this defect.   This consideration, in connection with others already stated, forces the mind to the conclusion that no settled purpose was entertained to make the transfer of the petitioner's estate altogether dependent on a formal instrument, more especially as no single good purpose can be subserved by such a construction of the act, and so much room may be afforded by it for the introduction of mischief and wrong.   To indicate a deliberate intent to work a change so important, we have a right to expect the employment of language so explicit as to shut out doubt; as, for instance, an express declaration that, without an assignment executed, the proceeding should be of no effect, notwithstanding the comprehensive terms of the thirty-fourth section.   Such, or some

thing similar, would, I think, have been the language used, had the legislature conceived the idea imputed to it.   But not only is there an entire omission of such negative language, but we find nothing commensurate with the provision of the act of 1730, that "*by such assignment*, the estate, interest, and property of the lands, goods, and effects so assigned" should pass; a provision which certainly would have had place in the last act, had it been intended to restore the old law in this particular. .

We have no hesitancy, then, in saying that the property, of which the debtors had attempted no conveyance prior to their application for the benefit of the insolvent laws, passed to the trustees by mere operation of law, at the moment of the insolvent's discharge.

Indeed, this, as I understood, was scarcely controverted on the argument.   But the estates sought to be recovered in these actions do not stand in that predicament.   They were actually conveyed before the application of the insolvents.   Although this conveyance has been declared fraudulent, as against creditors, it is insisted there is a difference between property covered by it and that which was actually vested in the insolvents at the time of their discharge.   This difference is supposed to spring from the 36th section of the act.   It provides that the trustees shall have power to recover and dispose of any real or personal estate, conveyed or transferred by the insolvent before his discharge, in fraud of creditors, "as fully and effectually as if the said insolvent had been actually seized ·or possessed thereof at the time" of making his assignment in court.   The argument, in brief, is, that as this was found necessary to enable the trustees to recover aliened property, it must be accepted that such property passes not under the other provisions of the statute.   It is said too, that as even a fraudulent conveyance is good, as against the fraudulent grantor, to divest his estate, property, the subject of such a grant, cannot be said to be the estate of the insolvent, and, consequently, is not within the purview of the 34th section.   But the answer is easy to both branches of this proposition.   It was never doubted that fraudulently aliened property passed under the general provisions of the act of 1814, which contained no feature similar to the 34th section; or if a doubt existed, it was put to rest by Englebert *v.* Blanjot, 2 *Whar.* 240.   Had the 34th section been omitted in the later act, there would have been as little doubt of its general efficacy to pass such property.   Does the introduction of that section operate to restrain that general efficacy?   I do not perceive how this can be reasonably pretended.   The truth is, it is merely cumulative, and was intended to put beyond question the interest taken by the trustees, in its broadest aspect, and not to restrain it.   It was, most probably, inserted to meet an opinion expressed by the District Court of this county, on the trial before it of Englebert *v.* Blanjot, 1 *Miles* 224, that as the act of 1814 contained no provision similar to

[Moncure *v.* Hanson.]

the 5th section of the act of 1807, relating to domestic attach-ments, an insolvent trustee was not entitled to recover property which had been fraudulently assigned, though the individual cre-ditors might do so. This notion was shown to be erroneous by this court, when reviewing that decision, after the passage of the act of 1836; but, I have little question, the doubt raised led to the intro-duction of the new provision, borrowed from the act of 1807, *ex majore cautela*. It was not inserted to create a distinction between different portions of the debtor's property, nor can it be permitted to have that effect. As to the argument raised on the last clause of this section, " as fully and effectually as if the said insolvent had been actually seized or possessed thereof at the time of such assignment," it is sufficient to say, the reference to the assignment seems to have been made more emphatically to declare the trus-tee's interest and power, than if the debtor's possession had been referred to a period more remote. It is thought by the plaintiff's counsel, that the decision in Ankrim *v.* Woodward, 4 *Rawle* 345, under the domestic attachment law, leads to a different result. But that is a mistake. The same idea appears to have been ad-vanced in Englebert *v.* Blanjot, but it was met by the observation that there was nothing in the case cited in conflict with the con-clusion arrived at in the principal case; no more being there ruled than that trustees in a domestic attachment are not exempt from defalcations to which the absconding debtor would have been sub-ject; for the only principle that could touch the point in question was disposed of by the attachment law of 1807, which, by investing the trustees with property fraudulently conveyed by the debtor, was but declaratory of the common law. Ankrim *v.* Woodward was, in fact, decided on the assumption that the transfer from the son to his father was *bona fide*. This court expressly distinguished it from a case of fraudulent transfer; and I happen to know, as counsel in the cause, that, afterwards, a recovery was actually had against the father, upon the ground that the pretended sale of the store goods to him was in fraud of creditors.

The second branch of the plaintiff's proposition, also, finds its answer in Englebert *v.* Blanjot. It has been already adverted to, in another part of this opinion, when stating the principle recognised by that authority, that a fraudulent grantor or donor is still esteemed as invested with an estate in the property aliened, for the benefit of creditors sought to be defrauded. This principle is so clearly propounded in the case cited, that it is sufficient merely to point to it here.

Nor is there any thing in this conclusion hostile to the determi-nation in Weber *v.* Samuel, 7 *Barr* 500, as the plaintiff insists. That decision proceeded upon the ground that the assignment of June 1837 was voidable, and not absolutely void, and that, until the assignees had notice of an intention to avoid it, they had an

equity to be protected from loss in obeying its instructions.   The
case recognises the interest and authority of the trustees from the
moment of their appointment, and though it speaks of giving secu-
rity as a preliminary to their authorized action, it was not intended
to insist upon this as absolutely necessary to assist a transfer of the
property.   The truth is, the point we have been engaged in dis-
cussing was not so distinctly presented there as to attract the criti-
cal attention of the court.  We were called on to decide nothing more
than whether the assignees were entitled to protection, and sufficient
was found in the facts to afford this, without accurately ascertain-
ing the precise moment when the insolvent's estate passed to the
trustees.   That estate might very well be in them, and yet the
voluntary assignees be held, under the circumstances, unanswerable
for the distribution of a portion of it.  No such considerations, how-
ever, enter into the present question.

In Commonwealth *v.* Lelar, 1 *Harris* 26, nothing more was de-
cided than that, after the lapse of years, during which the appointed
trustees were perfectly supine, doing nothing and demanding no-
thing, the law will presume the object of the trust satisfied, and that
the property remained in the debtor so far as to constitute him a
sufficient party to a *scire facias*.

But the answer to the second question stated in the outset, is
also fatal to the plaintiff's title.   If it be conceded the insolvent
trustees were clothed with no power of interference until they gave
security after the execution of the assignment, still this was before
the sheriff's sale, at which the plaintiff purchased.   From that
moment, at least, they were the only persons who could interfere
with the voluntary assignment, according to Weber *v.* Samuel.
At that time, the plaintiff had acquired no interest in the proper-
ties in dispute, and the intervention of the trustees effectually
barred him from further proceedings under his judgment.  Nothing
less than a sale and purchase before the trustees were in a position
to act,—even if the idea of the plaintiff as to the power of the trus-
tees be adopted—could place him in the posture of a contesting cre-
ditor described in Seal *v.* Duffy, 4 *Barr* 274.   But before this
could be effected, the rights of the trustees attached, and the
plaintiff had no other remedy than, in common with the other cre-
ditors, to hasten the action of the trustees.

But can the defendant take advantage of the outstanding title
vested in the trustees, or of their exclusive right of interference,
so as to bar the plaintiff's recovery in this action?   It is said he
cannot, because of the title he set up in himself, by the notice
given at sheriff's sale, and the application of the principle that if
one give notice of a particular title, which turns out to be defective,
he shall not afterwards set up another, as against him to whom the
notice was given, having no knowledge of the latter.   But this
principle is inapplicable here.   It is founded in the doctrine of

[Moncure *v.* Hanson.]

estoppel, which forbids one, who has misled another by a false assertion to do what otherwise he would not have done, from asserting the truth in detriment of the party misled. This, however, can only happen where the second title is in the person falsely or incautiously averring the first, and the other party is ignorant of the former. The doctrine has no place where, as here, the sufficient title is outstanding in a third person, and is equally known to both the contestants.

The view taken makes it unnecessary to inquire whether the title of R. & I. Phillips in the Sixth street estate is sufficiently established. If it be not, the plaintiff is in no position to derive any advantage from the defect, in this action.

Without travelling over the numerous points made on the record, enough has been said to decide this contest against the plaintiff. The judgment rendered at *Nisi Prius* is, consequently, to be reversed.

Judgment reversed.